USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/6/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

FALLS LAKE NATIONAL INSURANCE          :
COMPANY,                               :
                                       :
                          Plaintiff,   :
         -against-                     :          22-CV-9354 (VEC)
                                       :
BEST INTERIOR SOLUTIONS INC., ARTHUR   :          OPINION AND ORDER
J. BURKE, 301 EAST 81ST PH 20 INC.,    :
PROFESSIONAL INTERIOR CONTRACTING,     :
INC., SHWETA RAWAT, MONEESHA SANI      :
2019 REVOCABLE TRUST, BRODERICK        :
STORIE, PROFESSIONAL INTERIOR          :
CONTRACTING, INC., ICON REALTY         :
MANAGEMENT LLC, 301 EAST 80TH REALTY   :
LLC AND 1562/1564 SECOND REALTY LLC,   :
                                       :
                          Defendants.  :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case involves a policy of insurance that Plaintiff Falls Lake National Insurance

Company ("Falls Lake") issued to Defendant Best Interior Solutions, Inc. ("Best"). Defendant

Professional Interior Contracting, Inc. ("PIC" and, along with Best, "Defendants") subcontracted

Best to do limited work in a condominium unit. While preparing to paint the unit, Best placed

Masonite over certain surfaces, including a sink, as protection. Overnight, a piece of Masonite

fell and struck a faucet, causing water to spill over the covered sink, damaging several units and

common areas in the condominium building. Falls Lake initiated this action and moved for

summary judgment, seeking a declaratory judgment that the insurance policy it issued to Best

does not cover any of the resulting property damage. Defendants cross-moved for summary

judgment seeking a declaration that Falls Lake breached its duty to defend.[1] Falls Lake's motion

---

[1]    Although Falls Lake moved for summary judgment as to all Defendants listed in the caption, only Best and
PIC responded to the motion.

for summary judgment is denied, except with respect to its argument that certain non-responding defendants are not additional insureds, and Defendants' cross-motion for summary judgment is granted in part and denied in part.

## BACKGROUND[2]

This insurance coverage dispute relates to a policy of insurance that Falls Lake issued to Best, covering the period of August 24, 2021, through August 24, 2022 (the "Policy"). Joint Rule 56.1 Statement ("J. 56.1"), Dkt. 136, ¶ 1.

### I.    Beckford House and Unit 20

Prior to 2015, there was a four-story apartment building located at 301 E. 81st Street in Manhattan. *Id.* ¶ 12. Beginning in 2015, that building was demolished, and a new 21-story building containing 32 residential condominium units was constructed ("Beckford House"). *Id.* ¶¶ 13–14. On June 24, 2021, Defendant Shweta Rawat purchased Unit 20 from the Sponsor and transferred ownership of the unit to Defendant 301 East 81st PH 20 Inc. ("Corporate Owner"). *Id.* ¶¶ 17, 19, 89, 142. Ms. Rawat testified that she moved into Unit 20 as its primary resident in July 2022. *Id.* ¶¶ 90–93. She did not keep any personal belongings in Unit 20 prior to July 2022, and no one lived there before her. *Id.* ¶¶ 94–95, 129.

On November 1, 2021, the Corporate Owner contracted with PIC to perform work on Unit 20. *Id.* ¶¶ 23, 143.[3] The parties disagree over how to characterize PIC's work, although certain details regarding the scope of the work are not in dispute. Falls Lake asserts that PIC agreed to perform "major construction work" on Unit 20 before Ms. Rawat moved in. *Id.* ¶ 23.

---

[2]      The facts discussed in this section are undisputed, except where explicitly noted.

[3]      Defendants assert that "PIC was hired to renovate the unit in 2022"; Falls Lake denied that statement asserting that the agreement between PIC and the Corporate Owner is dated November 1, 2021. J. 56.1 ¶ 143. Regardless of the quibble over dates, all parties agree that in late 2021, PIC was hired to do some work in Unit 20; the exact date the contract with PIC was signed is not material.

According to Defendants, however, PIC agreed to perform "remodeling work," as Ms. Rawat testified that the work included "renovations," such as "adding a pantry, changing lighting, converting a bathtub to a shower, millwork," and converting a bathroom into a closet. *Id.* The parties agree that, under the agreement, payment documents, and change orders, "PIC's work included but was not limited to demolition, carpentry, electrical work, plumbing work, hvac work, millwork and metal allowance, and plastering and painting." *Id.* ¶ 25.

On December 15, 2021, PIC hired Best to paint, hang wallpaper,[4] and refinish the floors of Unit 20. *Id.* ¶¶ 28–29, 31. Before it began its work, Best laid down paper, plastic, and Masonite to protect the floor and other surfaces. *Id.* ¶ 31. The parties dispute whether PIC supervised Best's work and when Best's work began. *Id.* ¶¶ 27, 64. According to Falls Lake, contractors first arrived to perform work in Unit 20 on December 16, 2021. *Id.* ¶¶ 62–64; Pl. Decl., Ex. H-3, at 73.[5] Andy Kukla, on behalf of PIC, testified that PIC was responsible for supervising Best's work. J. 56.1 ¶¶ 110, 117.[6]

## II.    Damage to Unit 20

On January 11, 2022, Falls Lake received notice of claims related to property damage at the Beckford House (the "Beckford Claims").[7] *Id.* ¶ 40. That notice indicated that on January 5,

---

[4]    The parties describe this aspect of the work as applying "special finishes on the walls." J. 56.1 ¶ 29. The Court understands that to be synonymous with hanging wallpaper.

[5]    Although Defendants deny their workers first arrived on December 16, they do not cite to countervailing evidence to support their denial. J. 56.1 ¶ 64.

[6]    Defendants deny these allegations and argue that "there is no evidence PIC supervised, directed or controlled the injury-producing work so as to make it legally responsible." J. 56.1 ¶ 117.

[7]    Falls Lake's Memorandum of Law in support of its motion for summary judgment defines the Beckford Claims as claims for coverage for property damage to Units 17, 18, 19, and 20, as well as to other units and common areas of the Beckford House, including claims asserted in the action captioned *Arthur J. Burke v. 301 East 81st PH 20 Inc., Professional Interior Contracting, Inc. and Best Interior Solutions, Inc.*, Index Number 154914/2022, pending in the Supreme Court of the State of New York, County of New York. Pl. Mem., Dkt. 133, at 1.

2022, Unit 20 sustained damage from Best's work as a painting subcontractor for PIC. *Id.* ¶ 41. According to the notice of claim, in connection with preparing to paint a bathroom, Best placed Masonite over a sink, countertop, and medicine cabinet to protect those surfaces from paint. *Id.* ¶ 41; Pl. Decl. Ex. B; *see also* J. 56.1 ¶ 119. Tape that was holding the Masonite over the medicine cabinet failed, allowing the Masonite to fall, strike the faucet, and open the tap. J. 56.1 ¶ 41; Pl. Decl. Ex. B; *see also* J. 56.1 ¶ 119. Because the sink was covered with Masonite, the water from the open tap ran onto the floor, flooding Unit 20 and other units. Pl. Decl. Ex. B.[8]

On January 12, 2022, Falls Lake acknowledged receipt of Best's claim and retained a company to investigate. J. 56.1 ¶¶ 42–43. The investigators reported that construction was not completed at the Beckford House and that, as of January 5, 2022, a certificate of occupancy had not been issued for the premises. *Id.* ¶ 46; *see also id.* ¶ 15.[9] By letters dated March 14, March 15, July 1, and August 5, 2022, Falls Lake disclaimed coverage based on the claim, tenders, and lawsuit filed by the owner of Unit 18, Arthur Burke, pending in the New York Supreme Court (the "Burke Action"). *Id.* ¶ 47; Pl. Decl. Ex. G.

In approximately May 2022, Ms. Rawat and the Corporate Owner paid the Beckford House $17,800 for property damage to the building's common areas. *Id.* ¶¶ 59–60, 107. PIC reimbursed them for those costs. *Id.* ¶¶ 61, 108. On November 1, 2022, Falls Lake commenced this declaratory judgment action. *Id.* ¶ 48; Compl., Dkt. 1.

---

[8]    Defendants appear to deny that any property damage was sustained and admit only that property damage loss was reported to Falls Lake. J. 56.1 ¶¶ 33–35. According to Falls Lake, property damage was sustained not just to Unit 20, but to Units 17, 18, and 19, as well as to other units in, and common areas of, the building. *Id.* ¶ 33.

[9]    Although Defendants take issue with Plaintiff's reference to an uncertified download from the New York City Department of Buildings ("DoB") in support of Falls Lake's assertion that no certificate of occupancy had been issued as of the date of the damage to Unit 20, *see* J. 56.1 ¶ 15, they admit that documents from the DoB confirm that a Certificate of Occupancy had not been issued for the Beckford House, *id.* ¶ 46. This dispute is not critical to the resolution of this lawsuit.

III.    **Policy Exclusions and Exceptions**

Several provisions of the Policy are relevant to the parties' dispute.

*1.    The New Residential Construction Limitation*

The New Residential Construction Limitation provides that insurance under the Policy does not extend "to . . . '[p]roperty damage' . . . in any way connected with or arising out of 'new residential construction' including . . . '[c]ondominiums.'"  J. 56.1 ¶ 2.[10]  "New residential construction" is defined as "operations relating to construction of a building, . . . not previously occupied or put to its intended use."  *Id.*  The New Residential Construction Limitation does not apply to: (1) "'new residential construction' if the total number of 'condominiums[]' . . . in the project or development does not exceed (20) individual units;" and (2) "remodeling, repair or maintenance operations performed on any individual 'condominium[]' . . . previously occupied or put to its intended use."  *Id.*

*2.    Additional Insured and Voluntary Payments Provisions*

The Policy endorsement titled "Additional Insured – Owners, Lessees or Contractors – Automatic Status When Required in Construction Agreement With You" (the "Construction Agreement Insured Endorsement") provides that when the insured is performing operations for another party and agrees with that party "in writing in a contract or agreement that such [party] be added as an additional insured" under the Policy, then that party is an additional insured under the Policy.  Pl. Decl., Ex. A ("Policy"), at 30.  Another endorsement, titled "Additional Insured – Owners, Lessees or Contractors – Completed Operations – Automatic Status When Required in a Written Contract With You" (the "Written Contract Insured Endorsement"), provides that when

---

[10]    The Policy defines "condominium" as "an undivided interest in common property within a multi-unit residential real property coupled with a separate interest in space comprising a unit," including "any individual unit, any model homes, any common areas and all appurtenant structures thereto."  J. 56.1 ¶ 2.

the insured and another party "have agreed in a 'written contract' that such [party] be added as an additional insured" under the Policy, that party is an additional insured under the Policy. *Id.* at 60. The Written Contract Insured Endorsement requires that a "written contract" be signed but specifies that definition of "written contract" applies only within that endorsement. *Id.* at 61.

Several provisions potentially preclude coverage to additional insureds. The Construction Management Errors and Omissions Exclusion provides that the insurance does not apply to "'property damage' . . . arising out of . . . [i]nspection, supervision, quality control, architectural, or engineering activities done by or for you on a project on which you serve as construction manager." J. 56.1 ¶ 3. The Contractors – Professional Liability Exclusion bars coverage for "'property damage' . . . arising out of the rendering of or failure to render any professional services by you or on your behalf" in "[p]roviding, or hiring independent professionals to provide, engineering, architectural, or surveying services in connection with construction work you perform." *Id.* ¶ 4. Under that exclusion, "professional services include . . . [s]upervisory or inspection activities performed as part of any related architectural or engineer activities." *Id.*

Finally, the Policy prohibits any insured from voluntarily making a payment, assuming any obligation, or incurring any expense, other than for first aid, without Falls Lake's consent. *See id.* ¶ 5.

## IV.    Procedural History

On November 1, 2022, Falls Lake initiated this action seeking a declaratory judgment that the Policy it issued to Best does not cover any of the property damage sustained at the Beckford House. *See* Compl.; Pl. Mem. at 1.[11] Defendants timely answered and asserted

---

[11]    The operative complaint is the Amended Complaint. *See* Dkt. 108.

counterclaims against Falls Lake seeking a declaratory judgment that the Policy covers the

property damage at the Beckford House, indemnification for the underlying actions, and

attorneys' fees in this action, *see* Answer, Dkt. 109.

The parties cross moved for summary judgment.  See Mot. for Summary Judgment, Dkt.

129; Cross-Motion for Summary Judgment, Dkt. 134.

## DISCUSSION

### I.     Summary Judgment Standard

A court will grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A party seeking summary judgment bears the "burden of showing that no

genuine factual dispute exists," and "the court is required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought."

*Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005) (quoting *Sec. Ins. Co.

of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Where, as here, the parties cross-move for summary judgment, a court applies the same

standard and examines each party's motion "on its own merits," drawing all reasonable

inferences "against the party whose motion is under consideration."  *Morales v. Quintel Ent.,

Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

### II.    Falls Lake's Motion for Summary Judgment

Under New York law, "an insurer bears the burden of proving that an exclusion applies."

*Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012).  If

the insurer meets that burden, "the burden shifts to the policyholder to prove that an exception to

that exclusion applies."  *Id.* at 122.  New York interprets insurance contracts "to give effect to

the intent of the parties as expressed in the clear language of the contract" by giving the terms of

such contracts "their plain and ordinary meaning." *Id.* (citations omitted).

"New York follows the maxim of *contra proferentem* in insurance cases: where the plain

language of a policy permits more than one reasonable reading, a court must adopt the reading

upholding coverage." *VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699 F.3d 727, 732 (2d Cir.

2012). Thus, to succeed on a claim that the terms of a policy bar coverage and relieve an insurer

of its duty to defend, the insurer must "demonstrate that the allegations of an underlying

complaint place that pleading solely and entirely within the exclusions of the policy and that the

allegations are subject to no other interpretation." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.,*

720 F.3d 71, 77 (2d Cir. 2013) (quoting *Hanover Ins. Co. v. Cowan*, 172 A.D.2d 490, 491 (2d

Dep't 1991)). Any ambiguity in a policy exclusion is resolved against the insurer. *See Ment*

*Bros.*, 702 F.3d at 124.

### A. The New Residential Construction Limitation Does Not Preclude Coverage

Falls Lake argues that the Policy's New Residential Construction Limitation (also

referred to as "the Exclusion") is unambiguous and precludes coverage of the Beckford Claims.

*See* Pl. Mem. at 6–15. There is no dispute regarding the language of the New Residential

Construction Limitation, which provides that insurance under the Policy does not extend "to . . .

'[p]roperty damage' . . . or any other injury, loss or damage in any way connected with or arising

out of 'new residential construction' including . . . '[c]ondominiums.'" J. 56.1 ¶ 2. The Policy

creates two exceptions to the Exclusion, however: the Exclusion does not apply to (1) "'new

residential construction' if the total number of 'condominiums[]' . . . in the project or

development does not exceed (20) individual units" (the "Minimum Units Exception"); and (2)

"remodeling, repair or maintenance operations performed on any individual 'condominium[]' . . .

previously occupied or put to its intended use" (the "Intended Use Exception"). *Id.*

1.  *Does the New Residential Construction Limitation Apply?*

The Exclusion applies.  Certain facts bearing on the Court's determination are not in dispute.  Although Ms. Rawat purchased Unit 20 in June 2021, she did not keep any personal belongings there until July 2022, and no one lived there before her.  *Id.* ¶¶ 94–95, 129, 142.  Investigators hired by Falls Lake reported that construction was not complete at the Beckford House,[12] and a certificate of occupancy had not been issued for the building at the time of the damage.  *Id.* ¶¶ 43, 46.[13]

In relevant part, the Policy defines "new residential construction" as "operations relating to construction of a building, . . . not previously occupied or put to its intended use, designed for occupancy in whole or in part as a residence by a person."  *Id.* ¶ 2.  The Exclusion, in turn, bars coverage for "[p]roperty damage . . . in any way connected with or *arising out of* 'new residential construction'" of certain structures, including condominiums.  *Id.* (emphasis added).

Falls Lake has carried its burden of proving that the Exclusion applies.  New York courts have long interpreted the phrase "arising out of" to consist of "'broad, general, comprehensive terms ordinarily understood to mean originating from, incident to, or having connection with' the subject of the exclusion."  *Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.*, 475 F. Supp. 2d 400, 409 (S.D.N.Y. 2007) (collecting cases) (citation omitted).  The Exclusion applies to property

---

[12]    But for Defendants admitting that "construction was not completed at the Beckford House" at the time of the damage, J. 56.1 ¶ 46, the Court may well have concluded that there is a material question of fact whether the Exclusion applies.  Regardless of whether a certificate of occupancy ("C of O") had been issued, it appears that units had been sold and were being occupied at the time of the damage.  The only evidence the Court can find in the record that construction of the building was not complete is a second- or third-hand report from the investigator that the owner of PIC believed that "the 16th floor [of the building] was under construction."  Pl. Decl., Ex. E, at 2.  It is far from clear whether PIC meant that the contractor that built the building was still constructing the 16th floor or whether PIC meant that the owner(s) of units on the 16th floor were, like Ms. Rawat, remodeling completed unit(s).

[13]    Defendants deny that a C of O had not been issued for the Beckford House prior to January 5, 2022, arguing that the uncertified downloads from the Department of Buildings cited at Pl. Decl. Ex. F do not establish that fact.  *See* J. 56.1 ¶ 15.  Other than their *ipse dixit* quarrel with the evidence on which Plaintiff relies, Defendants have not provided evidence that the documents on which Plaintiff relies are not reliable.  Moreover, elsewhere they admit that a C of O had not been issued.  *Id.* ¶ 46.

damage arising from "new residential construction," which, under the Policy, includes not only

the units in a building but also the building itself, where such a building has not previously been

occupied or put to its intended use.  *See* Policy at 62.  The Court finds that the Beckford House

as a whole had not been put to its intended use because the parties agree construction was still

under way.  J. 56.1 ¶ 46.  In light of the broad meaning New York law ascribes to the term

"arising out of" in insurance contracts and the parties' agreement that construction of the

building was not complete, the Court must conclude that Best's work in Unit 20 to prepare it for

its first occupant had some connection with the ongoing construction of the Beckford House.

Accordingly, Best's work falls within the Exclusion.[14]

### 2. *Do Any Exceptions to the Exclusion Apply?*

Because Falls Lake carried its burden to show the Exclusion applies, the burden now

shifts to Defendants to demonstrate that an exception to the Exclusion applies.  *See Ment Bros.*,

702 F.3d at 122.  New York courts interpret an insurance contract to afford "a fair meaning to all

of the language employed by the parties in the contract and leave[] no provision without force

and effect."  *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016) (citation omitted).  Defendants

argue that the Intended Use Exception applies because Unit 20 had been put to its intended use at

the time of the damage.  Def. Mem., Dkt. 134-9, at 4–6.[15]  The Court agrees.

---

[14]    The Court concludes in Section II.A.2 *infra* that the Intended Use Exception to the Exclusion applies.  That Exception also uses the phrase "put to its intended use."  In interpreting the Policy to give force to each of its terms, the Court finds that a condominium unit is put to its intended use when purchased, and not, as Falls Lake suggests, only when first occupied.  For the reasons discussed above, that same reasoning does not apply to interpreting the meaning of "put to its intended use" in the Exclusion, which, unlike the Exception, can apply to the building as a whole, rather than just an individual unit, and includes broad, "arising out of" language.  If the two phrases are interpreted to have the same meaning, however, the ultimate result would not change; Best would still be entitled to coverage, but it would be entitled because the New Residential Construction Limitation would not apply.

[15]    Defendants also argue that the Minimum Units Exception applies.  Def. Mem. at 6–8.  That argument is without merit.  The Minimum Units Exception provides that the New Residential Construction Limitation does not apply to "'new residential construction' if the total number of 'condominiums[]' . . . in the project or development does not exceed (20) individual units."  J. 56.1 ¶ 2.  It is undisputed that the Beckford House contains 32 residence

The New Residential Construction Limitation does not apply to "remodeling, repair or maintenance operations performed on any individual 'condominium[]' . . . previously occupied or put to its intended use." J. 56.1 ¶ 2. Although the parties disagree on whether PIC's work is better characterized as construction or remodeling, *see id.* ¶¶ 23, 25, the Court finds that there is no genuine factual dispute that Best was hired to perform remodeling work. Falls Lake's assertion that PIC was retained to perform "major construction work" is not supported by the exhibit it cites. *Id.* ¶ 23. The contract between the Corporate Owner and PIC does not describe the work PIC was hired to perform, and the only insight into the volume of the work contemplated is the contract amount of $1,649,980. *See* Pl. Decl. Ex. I. Ms. Rawat testified that PIC's work consisted of "renovations in the apartment." Pl. Decl., Ex. L ("Rawat Tr."), at 15. The parties agree that Change Orders submitted by PIC indicate that its work included "demolition, carpentry, electrical work, plumbing work, hvac work, millwork and metal allowance, and plastering and painting." J. 56.1 ¶ 25; *see* Pl. Decl. Ex. K. The Court cannot find any support for characterizing PIC's work as construction, rather than remodeling, and the portion of this work PIC indisputably subcontracted for Best to perform — painting, hanging wallpaper, and refinishing the floors, J. 56.1 ¶¶ 28–29, 31 — clearly falls within the term "remodeling."

Because there is no dispute that Unit 20 was not previously occupied, *id.* ¶¶ 94–95, 129, the applicability of the Exception turns on whether Unit 20 had been put to its intended use at the time of the damage. Defendants maintain that Unit 20 was put to its intended use when

---

units. *Id.* ¶ 14. That fact precludes application of the Minimum Units Exception, *see id.* ¶ 2, regardless of in how many units Best worked.

purchased from the Sponsor, whereas Falls Lake argues that the condominium could only be put to its intended use once occupied.  Def. Mem. at 4–6; Pl. Reply Mem., Dkt. 135, at 14–15.

The few New York State cases interpreting "intended use" exclusions mostly involve product or construction defects.  *See Mack-Cali Realty Corp. v. Peerless Ins. Co.*, 115 F. Supp. 3d 449, 455 (S.D.N.Y. 2015) (collecting cases).  Defendants tend to rely on product liability cases and out-of-state precedent in support of their position.  *See, e.g.*, *Logan's Silo Sales & Serv., Inc. v. Nationwide Mut. Fire Ins. Co.*, 185 A.D.2d 651, 652 (4th Dep't 1992) (roller mill sold to customer was "put to its intended use"); *Nautilus Ins. Co. v. Regal Lofts Condo. Assoc.*, 764 F. 3d 726, 733–35 (7th Cir. 2014) (finding that units in condominium were "put to their intended use" after personal property was moved in but before residents could access common areas); *N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 99 Cal. Rptr. 3d 225, 237–38 (Cal. Ct. App. 2009) (whether home under construction was "put to its intended use" is a question of fact).  The most relevant cases on which Falls Lake relies are also distinguishable.  *See* Pl. Reply Mem. at 8–11.  *RSUI Indemnity Company v. RCG Group (USA)* featured a similar exclusion, but the case focused on the interpretation of the phrase "commercial space in 'mixed-use' buildings." 890 F. Supp. 2d 315, 329–30 (S.D.N.Y. 2012), *aff'd*, 539 F. App'x 3 (2d Cir. 2013).  The exception in *Western Heritage Insurance Company v. Jacobs Development Corporation* provided that the exclusion did not apply to condominiums "erected, certified for occupancy and put to their intended use," but the magistrate judge did not need to interpret the provision to decide the plaintiff's motion for default judgment.  No. 12-CV-5718 NGG LB, 2014 WL 297792, at *5–6 (E.D.N.Y. Jan. 27, 2014).

Although the phrase "put to its intended use" is used in both the definition of "new residential construction" in the Exclusion and in the Intended Use Exception, it does not follow that if the meaning of the phrase in the Exclusion operates to render the Exclusion applicable, it

also cannot apply to keep a claim within the Exception.  J 56.1 ¶ 2.  As discussed above, the

Exclusion precludes coverage for property damage "*in any way connected with or arising out of*"

construction of a building or unit not previously put to its intended use.  *Id.* (emphasis added).

The Intended Use Exception provides that the Exclusion does not apply to "remodeling"

performed on an individual condominium that was previously "put to its intended use;" the

Exception does not include the "arising out of" language that appears in the Exclusion and does

not reference "new residential construction."  The "arising out of" language and the applicability

of the Exclusion to buildings allowed the Court to determine that the property damage to Unit 20

that occurred while the Beckford House was under construction fell within the Exclusion.  *See*

Section II.A.1 *supra*.  But the Intended Use Exception does not use the phrase "arising out of"

and references work on an individual condominium unit rather than construction of a building.

Those differences mean that Best's work could fall within the Exception even though the

Exclusion applies.

     The Court must interpret the Intended Use Exception to give force to each of its terms.

*See In re Viking Pump, Inc.*, 27 N.Y.3d at 257.  Falls Lake's position (a residential unit is put to

its intended use only after someone resides in the unit) is not reasonable.  It renders the "intended

use" phrase superfluous as it would be it duplicative of the phrase "not previously occupied."  In

contrast, Defendants' interpretation (a residential unit is put to its intended use when it is

purchased from the Sponsor) gives meaning to all of the terms in the Exception.  For that reason,

the Court concludes the latter is the meaning the parties intended.

     Even if Falls Lake's interpretation were a reasonable interpretation, because a

condominium, like any property, could be intended to be occupied by a purchaser or used as an

investment, Defendants' interpretation is also reasonable.  If both parties advance a reasonable

interpretation of the Intended Use Exception, New York law requires the Court to adopt

Defendants' reading and uphold coverage.  *See VAM Check Cashing Corp.*, 699 F.3d at 732; *see also Mack-Cali Realty Corp.*, 115 F. Supp. 3d at 456 (noting that, under New York law, it is unnecessary for a court to consider extrinsic evidence to interpret an ambiguous term when the issue is an insurer's duty to defend, as "[a]ny ambiguity as to the insurer's duty to defend is resolved in favor of the insured."  (quoting *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 144 (2d Cir. 2004))).

In short, Falls Lake is not entitled to a declaratory judgment that Best's claim is excluded by the Residential Construction Exclusion.

### B.  PIC Is an Additional Insured Under the Policy, and Questions of Fact Preclude Summary Judgment for Falls Lake on the Application of Exclusions to PIC

Falls Lake argues that PIC is not an additional insured under the Policy because the agreement between PIC and Best was not signed.  *See* Pl. Mem. at 15–17.  In the alternative, Falls Lake argues that PIC is not entitled to additional insured coverage because it was negligent in its supervision of Best's work.  *Id.* at 17–19, 22–25.[16]

---

[16]      Falls Lake also argues that the Corporate Owner and Ms. Rawat are not additional insureds under the Policy because neither had a written contract with Best.  *See* Pl. Mem. at 15–17 (citing *Gilbane Building Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 31 N.Y.3d 131, 134–35 (2018)); *see also* Policy at 30–31, 60–61. Neither the Corporate Owner nor Ms. Rawat opposed Falls Lake's motion for summary judgment.  Even so, the Court must examine Falls Lake's motion to ensure that there is no material issue of fact regarding the existence of a written contract between Best and either the Corporate Owner or Ms. Rawat, and that Falls Lake is entitled to judgment as a matter of law.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  Falls Lake cites Exhibit J to support its assertion that neither of those parties contracted with Best for additional insured coverage, Pl. Mem. at 16, but Exhibit J reflects only that PIC and Best entered a subcontractor agreement.  *See* Pl. Decl. Ex. J.  In discovery, Falls Lake demanded from PIC all contracts and subcontracts involving any party in the Beckford Claims, which PIC objected to on the ground that it called for information not within PIC's custody or control.  *Id.* at 2.  Best's principal testified that Best did not enter any agreement with the owner of Unit 20, *see* Pl. Decl., Ex. N, at 38, but also testified that he did not keep copies of any contracts, *id.* at 12. Ms. Rawat testified that she did not know Best, and that no one told her that a company other than PIC would be working in Unit 20.  *See* Rawat Tr. at 17.  Although the record is thin, it tends to show that Best did not sign a written contract with Ms. Rawat or the Corporate Owner, and no countervailing evidence has been presented to the Court; therefore, Falls Lake is entitled to judgment as a matter of law that neither the Corporate Owner nor Ms. Rawat is an additional insured.  *See Gilbane Building Co./TDX Constr. Corp.*, 31 N.Y.3d at 134–35; Policy at 30–31, 60–61.

1. *PIC Is an Additional Insured Under the Construction
   Agreement Insured Endorsement*

Contrary to Falls Lake's assertion, the agreement between PIC and Best did not need to

be signed in order for PIC to be an additional insured under the Policy.  The Policy provides two

avenues for a party to be an additional insured: the Construction Agreement Insured Endorsement

and the Written Contract Insured Endorsement.  *See* Policy at 30–31, 60–61.  The

former endorsement requires only that the insured was working for a party and that the insured

"agreed in writing in a contract or agreement" that the party be "added as an additional insured

on [the insured's] policy," *id.* at 30; the latter endorsement requires that the agreement be signed,

*id.* at 61.   The parties agree that PIC subcontracted with Best for work on Unit 20.  *See* J. 56.1 ¶¶

26, 28–30.  The unsigned Subcontractor Agreement between Best and PIC requires PIC "to be

Additionally Insured on all Certificates of Insurance."  Pl. Decl., Ex. J, at 15.  Because New

York law does not require the contract between PIC and Best to be signed absent an explicit

provision in the agreement, *see Zurich Am. Ins. Co. v. Endurance Am. Speciality Ins. Co.*, 145

A.D.3d 502, 503–04 (1st Dep't 2016), and because the parties do not dispute that a contract

existed, the language used in the Subcontractor Agreement satisfies the requirements of the

Construction Agreement Insured Endorsement.  Accordingly, PIC is an additional insured under

the Policy.

2. *Do Other Exclusions Preclude Coverage for PIC?*

Falls Lake points to several other provisions of the Policy that it claims preclude

coverage as to PIC because PIC was allegedly negligent in its supervision of Best.  Pl. Mem. at

17–19, 22–25.  Two separate endorsements to the Policy contain exclusions that effectively bar

coverage for property damage arising from supervisory, inspection, architectural, or engineering

activities.  *See* J. 56.1, ¶¶ 3–4; Policy at 43–44.  The provision of the Policy that the Court found

extends additional insured coverage to PIC likewise states that additional insureds are not covered for property damage arising out of such activities.  Policy at 30.

A genuine dispute of material fact prevents the Court from entering summary judgment in favor of Falls Lake on whether those exclusions apply.  First, even when construing the facts in Defendants' favor, Falls Lake has established that PIC had supervisory authority over Best.  The only relevant facts presented by the parties came from the testimony of PIC's representative, Andy Kukla, who testified that PIC supervised Best's work.  *See* J. 56.1 ¶¶ 110, 117; Pl. Decl., Ex. M ("Kukla Tr."), at 18.  Although Defendants' dispute that assertion, they point to no other countervailing facts sufficient to create a genuine factual dispute.

There are, however, genuine disputes of material fact whether PIC was negligent in its supervision of Best's work.[17]  Falls Lake argues that PIC was indisputably negligent because the president of Best, Aleksander Kandov, established that Best completed its protection work prior to December 25, 2021.  Pl. Decl., Ex. N ("Kandov Tr."), at 6–7, 13–15, 26.  Mr. Kukla testified that prior to the water leak on January 5, 2022, employees of PIC likely entered the unit only once, on the day before the leak, in order to discuss PIC's scope of work.  Kukla Tr. at 18–22.  Therefore, Falls Lake argues, PIC was negligent in supervising Best's work because PIC left Best's work unattended for 10 days.  Pl. Mem. at 17–18.

The difficulty with Falls Lake's argument is that, construing the evidence in the light most favorable to Defendants, nothing was happening in Unit 20 during those ten days.  Mr. Kandov testified that Best completed its "protection work" about 10 days prior to January 5, and the next time Best was in the apartment was on January 5, after the flood had occurred.  Kandov Tr. at 26.

---

[17]    The Court also struggles to see how the property damage at issue "arose from" PIC's supervisory activities.

If the trier of fact accepts Mr. Kandov's testimony, there was no reason for PIC to be in the apartment "supervising" Best prior to the day of the flood. While it is conceivable that a trier of fact could conclude that it was negligent to put protective Masonite over a lavatory attached only with blue tape, that is not the argument Falls Lake is making. Even if it were, the Court cannot conclude, as a matter of law, either that Best was negligent in how it laid down protection (and therefore PIC was negligent in not intervening) or that PIC was negligent in its supervision of Best's work protecting the floors and other surfaces.

### C. There Is a Genuine Dispute of Fact Whether Defendants Admitted to Liability

Falls Lake argues that because Defendants admitted to liability, they violated the terms of the Policy. Pl. Mem. at 19–22. The Policy provides that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Falls Lake's] consent." Policy at 17. An insurer's right to consent to any settlement is a condition precedent to coverage under New York law, and an insured's violation of a condition precedent relieves an insurer of its obligation to perform. *See PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 249–50 (S.D.N.Y. 2010). On the other hand, if "an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured party's claim, and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent." *Isadore Rosen & Sons, Inc. v. Sec. Mut. Ins. Co. of New York*, 31 N.Y.2d 342, 347 (1972) (citation and internal quotation marks omitted). Repeated assertions that claims are not insured constitute a denial of liability as a matter of law and allow an insured to settle those claims without the insurer's consent. *See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 151 A.D.3d 632, 633 (1st Dep't 2017).

17

By letters dated March 14, March 15, July 1, and August 5, 2022, Falls Lake disclaimed coverage under the Policy to Best, PIC, and other claimants, citing many of the same provisions and exclusions on which it now relies. J. 56.1 ¶ 47; Pl. Decl. Ex. G. Ms. Rawat testified that, following the leak on January 5, 2022, she "immediately spoke" with PIC, and PIC assured her "that they would take care of the situation" and that "the problem would be resolved." Rawat Tr. at 54. At some point in time, PIC explained to her that it "would cover" the costs for "all the damages." *Id.* at 61. Mr. Kukla testified that he had that conversation with Ms. Rawat but thought it may have been "weeks" after the incident. Kukla Tr. at 30–33. Mr. Kukla also testified that, a day or two after the leak, he had a conversation with Mr. Kandov, who admitted Best was responsible and said his insurance would "take care of it." *Id.* at 28–30. Mr. Kandov, however, testified that there was no agreement between Best and PIC regarding the damage. Kandov Tr. at 38. The Beckford House sent invoices to the Corporate Owner dated April 18, 2022, and July 15, 2022, demanding $17,800 for the damage to the Beckford House. Pl. Decl., Ex. U, at 8, 17. Ms. Rawat or the Corporate Owner paid that amount, along with other amounts due for common charges, on July 18, 2022. *Id.* at 18. By invoice dated August 5, 2022, and sent to Ms. Rawat on August 8, 2022, PIC credited her $17,800 against her obligation to PIC for the amounts she paid to the Beckford House. J. 56.1 ¶ 61; Pl. Decl., Ex. U, at 5, 12.

Falls Lake cannot demonstrate as a matter of law that PIC or Best breached the condition precedent that either had to obtain Falls Lake's consent before making a payment or assuming any obligation. PIC did not reimburse Ms. Rawat until after Falls Lake had explicitly denied coverage on several occasions; by that point, PIC was no longer required to seek Falls Lake's consent. *See Vigilant Ins. Co.*, 151 A.D.3d at 633. Construing the facts in the light most favorable to Defendants, Falls Lake likewise has not demonstrated that the oral assurances made by Best and PIC constitute an "assumption of obligation" under the Policy. It is not clear from

18

the record whether PIC's oral assurances to Ms. Rawat, which occurred "weeks" after the leak,

occurred before or after Falls Lake first disclaimed coverage.  A trier of fact may or may not see

those conversations as Falls Lake does, but the "assurances" by PIC are too vague for the Court

to conclude on summary judgment that they constituted admissions of liability.  Likewise, Best's

principal denies that he told PIC's principal that Best would cover the damage.

Accordingly, Falls Lake's motion for summary judgment is DENIED as to Best and PIC

and GRANTED as to the Corporate Owner and Ms. Rawat.

## III.    Defendants' Motion for Summary Judgment

Defendants cross-moved for summary judgment, seeking a declaration that Falls Lake

breached its duty to defend Best and PIC and a referral to a Magistrate Judge for a calculation of

damages.  *See* Def. Mem. at 9–10.  Defendants also argue they are entitled to attorneys' fees in

this litigation and a declaration that Falls Lake must indemnify Defendants in the underlying

actions that are rooted in damage from the flooding that arose from Best's work in Unit 20.  *See*

*id.* at 14–15.

### A.  Falls Lake Breached Its Duty to Defend

Under New York law, an insurer's duty to defend is "exceedingly broad," requiring it "to

provide a defense whenever" a complaint's allegations suggest "a reasonable possibility of

coverage."  *Regal Const. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 37

(2010) (citations omitted).  The duty to defend applies to named and additional insureds alike.

*Id.*

In light of the legal conclusions and factual disputes the Court identified above, Falls

Lake did not establish "as a matter of law that there is no possible factual or legal basis on which

it might eventually be obligated to indemnify" Best and PIC under the Policy.  *Allstate Ins. Co.*

*v. Zuk*, 78 N.Y.2d 41, 45 (1991).  Falls Lake thus breached its duty to defend.  As discussed

19

above, several of the issues raised in this lawsuit pertaining to Falls Lake's duty to defend are amenable to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *CSX Lines*, 432 F.3d at 433. For the reasons discussed in Section II.A.2 *supra*, because the Intended Use Exception to the New Residential Construction Limitation applies, that limitation does not permit Falls Lake to disclaim coverage. Additionally, PIC is an additional insured under the Policy. *See* Section II.B.1 *supra*. Finally, the payment PIC made to Ms. Rawat to reimburse her for her required payment to the Beckford House did not violate PIC's obligation to first receive Falls Lake's consent before making payment. *See* Section II.C *supra*. Because there are factual disputes that precluded a grant of summary judgment for Falls Lake on the remainder of the parties' contested issues, there is a reasonable possibility of coverage. *See Regal*, 15 N.Y.3d at 37. That reasonable possibility means that Falls Lake has a duty to defend Best and PIC. *See id.*

Because Falls Lake failed to defend Best and PIC against the Beckford Claims, Defendants are entitled to summary judgment on their claim that Falls Lake breached its duty to defend.

### B.  Defendants Are Entitled to Attorneys' Fees

New York law provides an exception to the general rule that a prevailing party may not recover attorneys' fees. An insured is entitled to attorneys' fees if it is "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations," such as by seeking declaratory judgment that it has no duty to defend, and the insured "prevails on the merits" of that action. *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 3 N.Y.3d 592, 597–98 (2004) (citation omitted). Best and PIC have prevailed on the merits in this litigation and are, therefore, entitled to an award of attorneys' fees for their defense of this action.[18]

---

[18]    Falls Lake relies on cases where assignees were not entitled to attorneys' fees to argue PIC is not entitled to fees. *See* Pl. Reply Mem. at 24. Those cases are inapplicable because PIC is an additional insured under the Policy,

### C.  The Issue of Falls Lake's Duty to Indemnify Defendants Is Not Ripe

Defendants have failed to demonstrate that the Court has jurisdiction to issue a declaratory judgment regarding Falls Lake's duty to indemnify.  Whereas "the duty to defend is triggered by the filing of a lawsuit," "the duty to indemnify is triggered by a determination of liability."  *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 93 (2d Cir. 2023) (citation omitted).  For a district court to have jurisdiction to issue a declaration regarding an insurer's duty to indemnify, "the court must find a practical likelihood" that a third party "will *prevail* in litigation" against the insured.  *Id.*  If the Court cannot yet make that determination, a declaratory action regarding the duty to indemnify must be denied because it is not ripe.  *See id.* at 93–94.

Defendants have identified two lawsuits that underlie their declaratory judgment action: *Privilege Underwriters Reciprocal Exchange v. Best Interior Solution, Inc. et al.*, Index Number 153782/2024, pending in the New York Supreme Court, New York County, and *Arthur J. Burke v. 301 East 81st Ph 20 Inc. et al.*, Index Number 154914/2022, pending in the New York Supreme Court, New York County (collectively, the "Underlying Actions").  Def. Mem. at 1. No party has provided the Court with any information from which the Court could determine whether the third parties in the Underlying Actions are likely to prevail, and no court has ruled on the merits of either case.  Accordingly, Defendants' request for declaratory judgment that Falls Lake owes a duty to indemnify Defendants is not ripe.

---

not an assignee.  Falls Lake's argument that Defendants' failure to supply proof of attorneys' fees incurred precludes a fee award is without merit, *see id.* at 25; Defendants are entitled to a fee award as a matter of law, and exact damages can be determined at a subsequent hearing.

**CONCLUSION**

For the foregoing reasons, Falls Lake's motion for summary judgment is DENIED IN PART and GRANTED IN PART.  Falls Lake is granted a declaratory judgment that it owes no duty to defend the Corporate Owner and Ms. Rawat, but it has failed to show that it is entitled to summary judgment regarding its duty to defend Best and PIC.  Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Best and PIC are GRANTED a declaratory judgment that Falls Lake owes them a duty to defend and attorneys' fees in connection with their defense of this lawsuit; Defendants' motion for a declaratory judgment that Falls Lake has a duty to indemnify is DENIED without prejudice to re-raising the issue when it is ripe.

The parties are ordered to meet and confer and attempt to resolve the amount due to Defendants as attorneys' fees.  They must file a joint letter not later than **Friday, February 28, 2025**, stating whether they reached a resolution.  If the parties fail to reach a resolution, the Court will refer them to a Magistrate Judge for a hearing to determine the amount of attorneys' fees due to Defendants.

The Clerk of Court is respectfully directed to terminate the open motions at Dkts. 129 and 134.

**SO ORDERED.**

Date:  **February 6, 2025**
        **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**